Next we'll call the case of CGB Occupational Therapy, Inc. v. RHA Health Services, Inc. et al. Okay, Mr. Tegger, is it? Yes, your honor. You may proceed. Thank you, your honor. Evan Tegger, representing Sunrise, and I request three minutes for rebuttal. The two overarching questions that the court needs to address in order to resolve this rank on the reprehensibility spectrum, and what is the proper measure of the harm to the plaintiff for purposes of determining the ratio of punitive damages to the harm. I'll address the reprehensibility issue first. I'd like to stress at the outset that the torrid issue here was barely tortious at all. The first panel found that there was a tortious interference based on its belief that there was a breach of fiduciary duty between Sunrise and RHA, its principal. If RHA had not told Ms. Tomes not to interfere with the therapist, there would have been no tort here at all. In other words, if she had done exactly what she had done, but had never heard from RHA that she shouldn't do it, there would have been no tort. Now interestingly, the CFO from RHA, who was the one who made that directive to her, testified at the trial that even knowing everything that transpired, he still doesn't think that she actually recruited them. So what we've got here is a tort of only the most tenuous of nature. So that's the starting point. Now what we also have here is a tort that was a complete and total isolated incident. It didn't even happen at the second home that Sunrise was responsible for managing for RHA. It just happened at one of the two homes. It didn't happen anywhere else in Sunrise's organization. Was the jury entitled to weigh the evidence and decide this was deliberate, bad faith behavior aimed at wrecking the plaintiff's business? Was that something that they were entitled to make a judgment about? I think the second jury had to address reprehensibility, so that encompasses, you know, what is the state of mind, is it malicious, was there a bad motive, all of those things. So if they looked at that and decided the answer to those questions is yes, which one might fairly say they did, seeing as how they came back with a $30 million punitive verdict against your client, is it really in order for this court to say this is just a tenuous tort, not really a big deal? Yes, and the reason is that firstly, you don't know what they found. Yes, it was $30 million, but there was a heavy, heavy emphasis in this trial on the net worth of the defendant and how they were flying around in corporate jets. What was wrong with that? You seem to argue that there was something wrong with looking at your client's net worth. Well, you're supposed to punish the defendant for its conduct, not for how wealthy it is. That's a point that Judge Posner made in the Mathias case. What we had here was an all-out effort to take the focus off of the limited tort that happened here, which I emphasize was just one tortious interference with an at-will relationship with a therapist at one nursing home of a company that owns and manages hundreds throughout the world. So you've got one employee receiving no directive from anywhere higher up in the company, her only job was to run that one nursing home. Her tort is the only relevant focus here. There's no evidence in the record that anyone else at Sunrise knew what she was doing, told her to do it, that it was part of some bigger plan to get CGB. Indeed, the suggestion that there was some motive to crush CGB is nonsensical. What would be the purpose of wanting to get rid of a company that was providing good services and to destroy it? Is that the perspective we have to take on this, though? Do we have to say, what did upper management at Sunrise think of this, or do we take the in bad faith and with malicious intent as apparently found by the jury? Well, two responses. First, it is relevant how high up in the company the conduct is. It determines how wrongful it is. If it's lower down in the company, it's less wrongful than if it's a directive from upper management. But let me go back to the point, what did the jury find and what is the court's role? This is not a case in which we have a sufficiency of the evidence challenge to a finding of liability in which you're supposed to take all of the evidence in the light most favorable to the jury. On punitive damages excessive misreview, we don't know what the jury found. And the reason why wealth is relevant to this point, Judge Fisher, is because when there is that 800-pound gorilla in the room, you don't know whether the jury picked 30 million because it's a really, really, really wealthy company and it thought that that was modest punishment for a modest tort, or whether it believes some of the things the plaintiffs said that the defendants were up to. And I think if you actually review the entire record, you'll see no evidence of a malicious motive, no evidence of anything that went beyond this one facility. When you say no evidence of a malicious motive, isn't it the case that Sunrise's manager in the face of a direct assertion by CGB's president, do not talk to my therapist, and in the face of direct statements or encouragement from RHA, don't talk to those therapists, went ahead and did the recruiting? I mean, that's unrebutted, isn't it? When I say unrebutted, I mean, that's on the record. That's a finding. We're bound by that, aren't we? No, I don't think so. Let me just address directly the two things you said. There would be no tort if all that happened was that she disregarded Ms. Brillman's assertion that she shouldn't talk to therapists. I'm past the it's a technical tort case. No, I understand. But there's nothing wrongful about that part. She can do that. She can talk to the therapist. With respect to RHA, you said there's no evidence of maliciousness. That's what I heard you say. So there's no inference of maliciousness at all in the action of the Sunrise manager doing what she's told from two directions she is not permitted to do. That doesn't rise to any level of inference of maliciousness? RHA said don't recruit. It didn't say don't talk to them. And that's a difference because she testified that she was told by Craig Nauck, an outside attorney who was representing RHA, that it was okay to tell them that CGB was being terminated and to tell them the reason they were being terminated. So she thought, at least subjectively, that what she was doing was okay. There were rumors going around in the facility that the termination was in the works. Because the nursing director had come to her, and that's like an independent third party, and said, what's going on? There's all this rumor out that CGB is about to lose its contract. The therapists are up in arms. So yes, she went and she talked to them. But that doesn't mean it was malicious. Just because she disregarded Ms. Bronin saying, don't talk to them, I'm going to do it myself. She had a crisis at hand that she had to deal with. Aren't you arguing liability to us and not the quality of the punitive damages? It sounds like you're saying she really didn't do anything wrong here. But we're faced with a record where two juries did say they did something wrong, wrong enough to warrant punitive damages. And a district court judge in reviewing it said they did something wrong here, wrong enough to warrant punitive damages. So I'm not sure, I guess I'm missing the point. I'm not fighting liability. No, but you spent almost two-thirds of your time. You have three minutes left. And why don't you talk about the ratio of punitive damages. You're going to talk about it at your peril. You now have $250 left. I just want to say that it's a spectrum. And yes, they may be liable. But that doesn't take you off the short end of the spectrum. Now, with respect to the ratio, the plaintiffs attempt to enfold the denominator. Now, on this one, if your view is everybody's bound by the first verdict, the first jury found that the harm was $109,000. The plaintiffs had the opportunity to put on as much evidence as they wanted to in the first trial about what their harm was. They asked for $109,000. They got it. They can't come back now in the second trial and say, well, there's this, this, this, and this. I think it would violate the reexamination clause. It would violate collateral estoppel principles. So I think that you should begin and end with the $109,000. But let me just briefly address some of the arguments they have for expanding the denominator and explain why they're wrong. Well, first, let me mention that I think both Willowin and Sheedy, two precedents of this court, also strongly support that you take the jury's number. OK. I think you might spend your time better talking about the top number than the bottom number. Well, I think we've laid out in the briefs why the Supreme Court said that there's a strong presumption against ever exceeding single digits. You need low compensatory damages and high, high reprehensibility to get above singles. It said when compensatory damages are substantial, it might well be that a one-to-one ratio is the constitutional maximum. Now, our position here is that $109,000 is fully compensatory. It's substantial in terms of what was at stake here. And isn't this really a small amount? No, it's not. It's not a small amount. All the cases we cited in our opening brief distinguished between, and in the reply as well, I think we have about six or seven that draw the line somewhere around $10,000. In those cases, they said those were small amounts. But in this case... Well, there were some where they said 25 is not small. And you'll find them in a footnote, I think, in both our opening and reply. But couldn't the jury appropriately have found that 109 was a small amount and that as a result that they felt that the punitive damages should be a higher amount to properly compensate and to punish your client for its conduct? No, I don't think... I mean, the jury was off focusing on corporate jets and the net worth of the defendant. I think that the argument that $109,000 is insubstantial would just blow away State Farm. It would just mean that in every case someone could come in and say, well, even though I was fully compensated by a jury, it's still not good enough. I have one more question for you, which Judge Fischer is going to permit me to ask, even though your light's on. I do want you to address briefly, if you would, the assertion your opponents make that you, when Sunrise came forward and made a statement in a bankruptcy claim, reflecting an understanding about the potential liability and harm here, that the quality of the harm was in excess of potentially a million dollars. Why, you argue strenuously in your briefs that it would be wrong for us to look at that. I want you to explain to me, if you would, why we shouldn't say, hmm, if you thought the potential harm to CGB here was in excess of a million dollars, we shouldn't look at this as a potential harm kind of case and look at that number that you put forward in a claim and take it seriously. Okay, well, first let's take the potential harm analysis off the table because Willow Inn expressly rejected the argument that when there are actual damages awarded for the claim that you would use potential harm. But put that aside, the proof of claim covered both causes of action. Remember, the first appeal threw out the more expensive cause of action. Secondly, the agreement between RHA and Sunrise required indemnification not just of what they might be held liable for in lawsuits, but also defense costs. So this was basically, we took the complaint, we tried to figure out how much was alleged in the complaint. There were some very specific numbers there. There was also some general assertions. Took that, added it to an estimate of what the attorney's fees, and that's what the claim was. But they were only awarded $109,000 for this tort. Thank you. Will I be allowed any rebuttal? You'll have three minutes of rebuttal. Thank you. We'll call you back on rebuttal. Mr. Concannon. Thank you, Judge Fisher. May it please the court, my name is David Concannon. I represent the appellee, CGB Occupational Therapy. I want to start by saying there is no constitutional imperative in this case. None whatsoever. And I want to clear up the misconception that CGB asked for only $109,000 in compensatory damages. But they were awarded only $109,000. And that was a jury verdict, and that is now gone through its first stage of review. And so that's the compensatory, the economic damages we're dealing with. And that's what the first panel that heard this case sent it back to determine. Based on $109,000 compensatory damages, what is the appropriate punitive damages? And why do we work from there? Well, let me answer your question first, respectfully. The first panel threw the baby out with the bathwater. They didn't throw out the $109,000, they threw out the punitive. They threw out the lost profit damages that we asked for, for the rating of the therapists which were mistakenly allocated to the first claim. If you look at A2265-67 of the first record on appeal, I asked for lost profit damages for the rating of the therapists in the amount of $576,000. And I also asked for a finder's fee in the amount of $109,000. If I could go back in time five years, I would rewrite that jury verdict sheet and we would be talking about- Okay, but when we remanded this case, where did we say that there was any issue other than the appropriate punitive damages on the $109,000 compensatory damages? What the court said was that the appropriate issue was the amount of punitive damages on the rating of the therapists. The harm that resulted from taking- No, they didn't say on the rating of the therapists. Should we look at the language of what they said? My understanding is that it was a redetermination of the issue of punitive damages that Sunrise was found to be not responsible for terminating the contracts. But they were responsible for keeping CGB's therapists and recruiting them against the wishes of CGB and RHA. We must reverse the punitive damage determination and redetermination of punitive damages in accordance with this opinion. They didn't reverse the compensatory damages. What they did do, though, was that they didn't look at what the compensatory damages were- All right, but in looking at the bottom number, we look at the $109,000. Yes. Okay. So why don't we move on from there? We will. The $109,000, as this court found in Willow Inn, is not the full extent. You just said, we look at the $109,000. Well, I misunderstood your question. Okay. $109,000, like the $2,000 in Willow Inn. They didn't say redetermine the compensatory damages. I know. They said redetermine the punitive. Determine, well, they actually said determine in the million three what part of that ought to be punitive damages. And your opponent said, okay, well, let's open up the whole thing. So they're hoist on their own petard on that one. But we didn't say redetermine the compensatory damages. That is a fixed figure. And what I'm saying is, maybe my colleagues are interested in your theory. And if you want to talk about it, go ahead. Thank you. In redetermining punitive damages, you have to assess not only the actual harm, but the potential harm, the character of the harm, the motivation that underlies the harm, and get beyond simply compensatory damages. That's what the restatement says, and that's what we did in the second trial. They got a new trial, and we got a new trial. And we weren't allowed to talk to the jury about the $576,000. But what we were allowed to do was bring in the new evidence that Judge Jordan talked about, the proofs of claim from the bankruptcy court. Okay, and we've heard an explanation on that. But that does not change the award of $109,000 in compensatory damages. And when we're looking at the ratio, if we're gonna look at this as a ratio claim, then the ratio is the determination from the compensatory damages awarded. And there were no more than $109,000 compensatory damages awarded. I disagree with your honor. I do not believe- And that's what you were paid, right? Have you said, well, we got $109,000 and we haven't gotten our compensatory damages? I disagree with you that the ratio analysis is limited solely to the $109,000 in compensatory damages. That's what I disagree with. I think under the ratio analysis, you can look at the character of the harm. You can look at the economic incentive that Sunrise had for its conduct. You can look at the $1,850,000- But that's establishing the ratio on top of the bottom number. Aren't you misstating, I mean, under the law and determining punitive damages, you can look at these other factors. But when looking at the ratio analysis, the only thing that you can look at under Willow Inn and other cases is the compensatory damage figure to come up with a ratio. But in Willow Inn- The jury determines the punitive damages. In Willow Inn, this court found that the compensatory damage figure of $2,000, and the argument advanced by Sunrise here was a red herring. It's not just $2,000. The ratio that you came up with in Willow Inn, $175,000 to $2,000, you said was not a ratio- That's not a ratio, Mr. Concannon. That's not a ratio. That's the punitive damage award. You're confusing the award with the ratio. Okay. In Willow Inn, there was a statutory provision for costs and attorney's fees. And those items had been set by the court. They were not in the outset. The statutory provision under the Pennsylvania Insurance Act had been set by the court, and there was a determination of the amount of attorney's fees and the amount of costs. Those were set figures that, along with the $2,000, were the cost of the litigation in the district court. And so that's why there is a difference between this case and Willow Inn, because here we are dealing with a statutory award of costs and attorney's fees. Let me pick up on something that Judge Fisher asked in accordance with the ratio analysis. Is it $109,000, a small amount of money? And the answer to your question is yes. It is a very small amount of money to this defendant, given the facts of this case. This defendant- How do you answer the assertion that legally we're not permitted to even think about how wealthy the defendant is? I take it, maybe I'm overstating a bit, but I understood your opponent's position to be, hey, defendants' wealth can't be taken into account here. Is that an erroneous statement of law? It's a completely erroneous statement of Pennsylvania law. It is absolutely incorrect. Okay, and second question, taking it as a given, for purposes of argument, whether you agree with it or not, that $109,000 is the denominator that we'd be looking at. Why is $2 million still a good number, even if it's a ratio that takes us out of single digits? What is it that makes this case qualitatively the right one to let a $2 million figure stand? One, I take it, is you're saying, well, wealthy defendant has some bearing. Anything else? Yes. What? $109,000 is a small number, and in this case, the economic incentive for the conduct at issue was so that Sunrise could continue to earn management fees, and their uncontested evidence is that they earned $1.85 million in management fees by retaining the CGB therapists at these homes, that evidence is uncontested, it's plaintiff's exhibit 47. It was admitted into evidence in the testimony of Cindy Brillman, and it was discussed when John West was on the stand. They admit they earned $1.8 million in management fees that they would not have earned. And it's not just, we talked about an isolated incident with only one member of Sunrise, it's not. If you look at the testimony of Tim Cox, who was at Sunrise Corporate, and if you look at the testimony of Tiffany Tomaso, they were well aware of what was Some pages which are actually missing from the appendix I noticed last night are Tim Cox discussing the motivation where he says he wanted a continuity of therapy services at these homes so that they wouldn't have the state of Pennsylvania come in and put a ban on admissions, and they wouldn't have to go back to zero reimbursement rates for Medicare and Medicaid. That was the motivation, it was financial. What about litigation conduct? Does that have any bearing here at all? It has bearing, yes it does. It has bearing under Pennsylvania law under Holic versus Erie Insurance Exchange, and it has bearing under Dunn versus Hobick. Pennsylvania has adopted the restatement 908 of torts, which says that one of the factors that you can consider in assessing community damage is the harm and the trouble that the plaintiff has gone to in enforcing its rights through litigation in this court or in others. That comes right out of this court's en banc decision in Dunn versus Hobick, and it's also part of the decision in the Holic case. And in this case, this summarizes conduct in this case goes beyond the pale. It goes beyond mere discovery abuse. It talks about lying to the court, submitting false affidavits, witnesses disobeying court orders to show up and testify. Preferential actions in the bankruptcy court, which the bankruptcy judge described as Machiavellian, threats, intimidation, drop this case or we will keep you in court forever, for years and years and years and years. This is not your typical case of hide the ball discovery. Did the district judge make statements about any of those things? Yes, he did. Yes, tell us about it. In the first trial, Judge Newcomer said, he said, I have never in my 30 years on the bench seen a case with more roadblocks that have been put forward in this case. Can you point us to that specifically in the record? It is in the supplemental appendix, and I'll have to get you the site, but I will do so, Your Honor. There were also assertions where witnesses were not telling the truth, and Judge Newcomer would interrupt them and ask them if you understand you're under oath. I submitted a letter from the bankruptcy court where this preferential payment was described. Cindy Broman testified in her, on the second day of trial, about the threats. Cindy Broman testified- Didn't the bankruptcy court determine that it was a preferential payment? Eventually. Yeah. After two years of litigation and threats and intimidation, yes, eventually. But it still took all that time and all that money for the bankruptcy court to say that this preferential case never should have been So, but there is testimony, and if I can't provide it now, I will provide it in a 20HA letter to the court in the appellate appendix from Cindy Broman, where she testified to- Sunset was saying this was a preferential payment, right? Yes, only Sunset. Yeah, right. On the creditors committee. Yeah, right, yeah. And the court did determine that it was a preferential payment. That's correct. Okay, so, I mean, what's the matter with that? What's the matter with that is that- I mean, Sunset is maintaining its position before the bankruptcy court, and the bankruptcy court agreed with it. No, the bankruptcy court agreed with CGB. That was not a preferential payment. Not a preferential payment, not. It would have been illegal for this payment to have been made as a preferential payment. And the preferential, all of that action in the bankruptcy court, and where threats were made, we'll drop this case here if you drop the case over in the district court, it's- Well, that's not a threat. Well, you didn't hear it when it was made. It was a threat. Cindy Broman thought it was a threat, and she testified to that. It's in the record. Mr. Concanon. Yes, sir. The initial jury verdict, you did not appeal what Sunrise did. That's correct. And this court reversed and sent back, or demanded to the district court for new trial and punitive damages consistent with the prior opinion of this court. That's right. Why weren't you limited to the $1.3 million? There was considerable confusion in the district court, and there's an actual opinion where Judge Newcomer, he had us in for a conference on this, and he couldn't make sense of the Third Circuit's opinion. And he says in a written opinion that it does not illuminate the way in which we're supposed to proceed. It was my position that the entitlement to punitive damages was a certainty and that the amount was there. And he said, no, we're gonna have a redetermination, not only as to entitlement, but also as to the amount. Well, I think your opponents thought that they could win on the basic issues, so they said, open the whole thing up, and they agreed to it. But the mere fact that that took place back there doesn't necessarily make it right. I'm sorry? The mere fact that at the district court level, Judge Newcomer may have said, well, we're gonna open it up, not only as to entitlement and to amount. That doesn't make it right. And that's why my question was posed is, weren't you perhaps limited to $1.3 million? Now, the second jury could have said, we think that all 1.3 of the prior jury's findings should go to Sunrise in the way of punitive damages. Well, keep in mind, Judge Fischer, that we were severely hampered in the first trial by the conduct of Sunrise. Their witnesses did not show up for trial. They were ordered to be there, and they didn't. The difference between the first trial and the second trial- You're not answering my question. You got an excellent answer to his question, and you're going off on a tangent. The answer is that- That they asked for a new trial. They asked for a new trial on all the issues, and they're hoist by their own petard, but nevertheless, Judge Fischer's question is, in looking at what the punitive damages ought to be, the jury determined that the whole overall globe should be 1.3 million, and if we're thinking about what is reasonable, shouldn't that figure be in our minds? Yes, it should, and it wasn't contested as unconstitutional in the first appeal either. I've seen enough time. Thank you. Thank you, Mr. Tigger. Mr. Tigger. Want to respond to, let me start with the idea that there was a gain or a potential gain to us of $1.8 million. That's wrong in multiple respects. Firstly, if you look at the actual contract, pages 470 to 471 of the joint appendix, shows the formula for determining the management fee. You multiply, if everything is going well and you're making a lot of money, you take the ceiling amount, which is the most you can get, multiply it by the number of beds, and multiply that by 12 for the number of months in the year. There's 180 beds in the facility. Tim Cox testified to that. So it comes out to approximately $350,000 a year for the entire management fee. Now, if you look at Plaintiff's own exhibit, which I believe is 48B, 48B, I think, purports to list all of the cost and expense.